IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM MULDOWNEY, | CIVIL ACTION NO. **1:10-CV-2555** |
| Plaintiff, | |
| | (CONNER, C.J.) |
| | (MEHALCHICK, M.J.) |
| v. | |
| K-MART CORPORATION, et al., | |
| Defendants. | |

## REPORT AND RECOMMENDATION

This matter is before the Court on a motion for summary judgment (Doc. 22) filed by Defendants K-Mart Corporation and Sears Holdings, Inc. The motion was referred to the undersigned United States Magistrate Judge for a recommended disposition pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated herein, the Court recommends that Defendants' motion for summary judgment (Doc. 22) be **GRANTED in part and DENIED in part**.

## I. BACKGROUND

This is an employment discrimination and retaliation action. In his complaint, Plaintiff William Muldowney, a Caucasian male, alleges that he was subjected to negative performance reviews and ultimately terminated for expressing his concerns about possible discriminatory treatment of another employee, who was Hispanic.

Muldowney began working for Defendants in October 2004 as Human Resources Manager at the K-Mart Distribution Center in Chambersburg, Pennsylvania. Among his various duties as Human Resources Manager, Muldowney was responsible for ensuring compliance with company HR policies and federal and state anti-discrimination laws at the

Chambersburg distribution center. As Human Resources Manager, Muldowney was directly supervised by the General Manager of the distribution center, but he also reported to an Area Human Resources Manager resident at the company's corporate headquarters in Hoffman Estates, Illinois.

In July 2008, James Hall became the General Manager of the Chambersburg distribution center. In September 2008, Muldowney received his 2008 mid-year review, his first written performance review with Hall as his direct supervisor. Muldowney's 2008 mid-year review was generally positive, but peppered with some critical feedback. In April 2009, Muldowney received his 2008 year-end review from Hall, which was also generally positive but critical of Muldowney's performance in certain areas. Over this same time period, Hall met with Muldowney on various occasions to "coach" him on certain performance deficiencies.

### A. The May 2009 Transfer of Martin Alvarez

On May 20, 2009, Hall spoke with Jeffrey Diamond, his Assistant General Manager, to discuss the transfer of Martin Alvarez, a department manager, from first to third shift, effective the next day. Hall and Diamond attempted to locate Muldowney, but were unable to find him. Hall was told by a payroll clerk who worked for Muldowney that he was out to lunch. Both Hall and Diamond attempted to reach Muldowney on his cell phone. Unable to reach Muldowney, Hall and Diamond initiated a mid-afternoon conference call with Alan Falkowsky, Division Vice President, and Brian Gartrell, Area Human Resources Manager and Muldowney's immediate superior, to discuss Alvarez's transfer. Neither Gartrell nor Falkowsky had any objection to the plan to transfer Alvarez. *See* Hall Dep. 31:4–12, Aug. 15, 2011 (Doc. 24 attach. 5).

Later that afternoon, about four hours after Hall and Diamond first tried to find Muldowney, Diamond received a brief return phone call from Muldowney. Muldowney told Diamond that he had been out scouting locations for a recruiting TV commercial. Diamond informed Muldowney of the decision to transfer Alvarez and they agreed to speak again later.

That evening, Diamond and Muldowney spoke on the phone again. Diamond later recounted the conversation at his deposition:

> [I]t was about six o'clock that night he called me at home on my BlackBerry and he said, ["W]ow, that was interesting this afternoon.["]  I go, ["Y]eah, it was interesting, because it sounded to me like you were being evasive of where you were at, Bill.["]  And then he quickly changed . . . the whole tone of the conversation. It went from him to Martin [Alvarez]. And he said something along the lines of, ["]we better be careful moving Martin because he is a tenured associate,["] and I think he said something about his ethnicity. I said, ["]Bill, we already partnered with corporate.["]  He goes, ["W]ell, I want to partner with corporate, too. I guess you don't need a . . . bleeping HR manager.["]  I said, ["]I need an HR manager I can contact when I need him.["]  He said, ["W]ell, I'm going to partner with corporate.["]  And I go, ["G]o ahead, that's fine.["]

Diamond Dep. 35:8–36:1, Aug. 15, 2011 (Doc. 34 attach. 1). Diamond also explained what he and Muldowney meant when they referenced "partnering with corporate": "He was going to call and just tell them what we were doing, which we normally would [do] when we're moving any [member] of management. . . . Because from a corporate perspective, . . . they need to know . . . , in each distribution center, who's in what role." Diamond Dep. 36:4–13, Aug. 15, 2011 (Doc. 34 attach. 1).

The next day, Muldowney and Diamond spoke about the Alvarez transfer again. Diamond recounted that conversation at his deposition as well:

> I don't really recall in detail what we talked about, but I think he made a comment about, ["]hey, I think we should have waited["] or ["]I still

don't agree that we moved him so quickly,["] or something like that. . . . [H]e thought we should be cautious when moving someone that's that tenured that is a minority . . . without partnering, which I told him . . . we did.

Diamond Dep. 36:21-25, 37:15-21, Aug. 15, 2011 (Doc. 34 attach. 1).

Muldowney also spoke that day with Brent Jasper, Gartrell's superior at corporate headquarters.

> [T]he day after I called corporate . . . to let them know about what was going on with Mr. Alvarez, that he had been transferred and that I had some serious concerns, as I also shared with Jeff Diamond, that this could be discriminatory in nature because I was out of the loop. I didn't know what documents there were. I kept hearing there was something someplace, but I didn't see any of it. Since I was out of the loop and since we had never transferred anybody that abruptly and without any HR input and he was Hispanic, 20-some years with the company and over 40, and as far as I could tell, hadn't done anything that I could see that was anything that deserved discipline, I was concerned. So I did share with corporate about that.

Muldowney Dep. 94:20–95:11, Sept. 13, 2011 (Doc. 30).

Muldowney also met with Hall that day, with Hall informally counseling Muldowney on several performance areas, including Muldowney's work ethic and his frequent and extended absences from the distribution center. It is unclear whether they spoke about the Alvarez shift transfer at this meeting, but in a deposition taken in separate litigation brought against the company by Alvarez, Hall acknowledged his impression that Muldowney "was nervous about [transferring Alvarez from first to third shift] because he thought it might look like we were retaliating against Martin [Alvarez] due to his race." Hall Dep. 73:8–10, Dec. 12, 2011 (Doc. 36).

A few days later, Muldowney spoke with his immediate superior, Brian Gartrell, who recounted the conversation at his own deposition:

> I remember [Muldowney] . . . raising a concern. I think he was more upset or frustrated that he was not consulted in the process, you know,

asked for his opinion on the transfer, initially, which, while we'd hope that there's a partnership along the way, it's certainly not something that was necessary that he signed off on or something that he had to necessarily approve. That's not his decision to approve. . . . I realize that Bill had indicated that he thought it was discriminatory and that's what he was hoping to either be in front of or at least, you know, prevent the perception or whatever that . . . concern was, but, again, he had talked to . . . my boss's boss and they had determined that that was a piece that we had done, pretty standard practice to move people from shift to shift.

Gartrell Dep. 18:14–19:9, Aug. 16, 2011 (Doc. 40).

B. Muldowney's 2009 Mid-Year Review and Performance Improvement Plan

Over the next several weeks, Hall continued to informally counsel Muldowney on alleged deficiencies. On June 24, 2009, Hall met with Muldowney and counseled him on three topics: (1) Muldowney's frequent absences from the building during the workday; (2) Muldowney's failure to complete a "vulnerability survey" as part of the company's "continual improvement" program, which had been due one week earlier; and (3) Muldowney's possible misuse of a company credit card. With respect to the credit card issue, an internal audit had revealed "suspicious" charges on Muldowney's company credit card, including a charge for an "orientation" lunch with an intern when Hall, Diamond and Muldowney had just had an orientation lunch with the very same intern the day before, and charges for lunch and Starbucks in connection with a management candidate interview. Hall instructed Muldowney to obtain advance approval from him for any future charges to his company credit card. On July 15, 2009, Hall met with Muldowney again to counsel him on his integrity: Muldowney missed a scheduled conference call with Brian Gartrell and other human resources managers, and Muldowney apparently told Gartrell that he had missed the call because he was involved in continual improvement training, which was untrue. Hall V.S. Ex. 1, at 3 (Doc. 24 attach. 3).

At the end of August 2009, Muldowney received his 2009 mid-year review from Hall. Muldowney Dep. Ex. 8, Sept. 13, 2011 ([Doc. 33](#)). The review was generally negative, noting in particular Muldowney's questionable decision-making, his poor performance in building customer relationships and in managing staffing, succession planning, and continual improvement processes, his poor work ethic, and his questionable integrity. The review indicated that Hall had met with Falkowsky and Gartrell, and they had agreed that Muldowney should be placed on a performance improvement plan—a ninety-day remedial plan outlining goals that the employee must accomplish to address his or her performance shortcomings and avoid termination.

Hall presented Muldowney with his performance improvement plan on or about September 15, 2009. Muldowney Dep. Ex. 9, Sept. 13, 2011 ([Doc. 33](#)). Muldowney's performance improvement plan summarized his performance deficiencies and identified four key areas in which Muldowney needed to show satisfactory improvement: accountability, teamwork, positive energy, and integrity. Muldowney was tasked with creating an action plan with measurable processes, including deliverables and deadlines, which he delivered to Hall on September 29, 2009. In particular, under the "integrity" section of Muldowney's action plan, he promised to "remain honest in all my dealings and communicate with integrity in every interaction." Muldowney Dep. Ex. 9 at p.3, Sept. 13, 2011 ([Doc. 33](#)). The performance improvement plan also called for weekly progress meetings between Muldowney, Hall, and Diamond.

C. The Maintenance Manager "Debacle"

Shortly after Muldowney began his performance improvement plan, the Chambersburg distribution center's maintenance manager resigned. Hall instructed

Muldowney to begin an immediate search for a new maintenance manager. Hall Dep. 48:4–16, Aug. 15, 2011 (Doc. 24 attach. 5). Muldowney posted the position and reviewed resumes that were submitted. Muldowney Dep. 66:20–67:5, Sept. 13, 2011 (Doc. 30). About a week later, Muldowney advised Hall that he had identified one particularly promising local candidate, Brian Haluska. Hall Dep. 48:16–19, 51:15–19, Aug. 15, 2011 (Doc. 24 attach. 5); Muldowney Dep. 67:16, 69:11–16, Sept. 13, 2011 (Doc. 30), *id.* Ex. 10 (Doc. 33). Hall asked whether Muldowney had done an initial phone screening interview, and Muldowney indicated that he had done so, and that Haluska was a strong candidate. Hall Dep. 48:20–22, Aug. 15, 2011 (Doc. 24 attach. 5). Hall told Muldowney to hold off while they considered a possible internal candidate for the position. *Id.* at 48:23–25; Muldowney Dep. 66:11–17, Sept. 13, 2011 (Doc. 30).

About a week later, Falkowsky told Hall to move forward with external recruiting for the maintenance manager position. On Wednesday, October 7, 2009, Hall asked Muldowney to schedule an onsite interview with Haluska. Hall Dep. 50:7–8, Aug. 15, 2011 (Doc. 24 attach. 5); Muldowney Dep. 69: 16–22, Sept. 13, 2013 (Doc. 30). Later that afternoon, Muldowney came to Hall's office and admitted that he did not phone screen Haluska after all – when Muldowney called to set up an onsite interview, Haluska told him that, although he had received a voice mail message from Muldowney, they had never spoken on the phone. Hall Dep. 50:8–14, Aug. 15, 2011 (Doc. 24 attach. 5); Muldowney Dep. 70:19–22, Sept. 13, 2011 (Doc. 30). (Hall later spoke with Haluska, who told him the same thing. Hall Dep. 51:10–14, Aug. 15, 2011 (Doc. 24 attach. 5).) Although Muldowney only remembered phone screening one candidate, he suggested that he had been under a lot of stress and might have phone screened someone else—whom he had since forgotten—and

confused the two candidates. *Id.* at 50:15–51:7; *see also* Muldowney Dep. 67:11–69:10, 69:23–70:18, Sept. 13, 2011 (Doc. 30) (Muldowney's account of the two phone calls). Hall spoke with Gartrell about the incident later that evening. Hall Dep. 52:3–14, Aug. 15, 2011 (Doc. 24 attach. 5).

On the morning of Thursday, October 8, 2009, Muldowney spoke with Diamond, asking him what he thought about the maintenance manager issue. Diamond told Muldowney that it sounded to him like Muldowney was lying. Diamond Dep. 52:16–25, Aug. 15, 2011 (Doc. 34 attach. 1). Muldowney spoke with Haluska again, and Haluska withdrew from consideration, citing a desire to return to school for a career change. Later than morning, Muldowney met with Hall and advised him that Haluska had withdrawn. Hall instructed Muldowney to write a statement about the incident. Hall. Dep. 52:14–16, Aug. 15, 2011 (Doc. 24 attach. 5); Muldowney Dep. 71:9–23, Sept. 13, 2011 (Doc. 30). Later that day, Muldowney submitted his written statement as requested. Muldowney Dep. 72:8–19, Sept. 13, 2011 (Doc. 30); *id.* Ex. 10 (Doc. 33) (Muldowney's written statement).

Hall claims to have met with Falkowsky and Gartrell later that day, and that the three agreed to terminate Muldowney effective the next day. Hall Dep. 52:16–19, Aug. 15, 2011 (Doc. 24 attach. 5). But the next day, Friday, October 9, 2009, Muldowney called off sick from work. Hall claims to have met with Gartrell again, the two of them agreeing to proceed with Muldowney's termination on Monday morning instead. Hall Dep. 52:19–21, Aug. 15, 2011 (Doc. 24 attach. 5).

D. The Alvarez Performance Improvement Plan

Meanwhile, management had been formulating a performance improvement plan for Martin Alvarez as well. On Friday, October 9, 2009, the operations manager supervising

Alvarez circulated an updated version of Alvarez's performance improvement plan, adding insubordination and failure to follow instructions as problem areas to be addressed. As Human Resources Manager for the distribution center, Muldowney was included on the email distribution list. At 9:29 p.m. that evening, Muldowney replied to all recipients of the operations manager's original email message:

> Are you guys pretty certain about adding this? I have similar concerns to those I had when I learned Martin was being moved from 1st to 3rd shift. He is a 40+ year old hispanic [sic] and I am concerned that the Company may be potentially open to discrimination charges. Much of what's here might be open to interpretation, and I'm not 100% sure about it at this point. But I was not there for any of the conversations or the follow-up you guys did.

> I recommend we run this by the [Area Human Relations Manager], reminding Gartrell of [Alvarez]'s 23 years with the company, age, and race before adding this to his [performance improvement plan].

Email from William Muldowney to Erin Roat et al. (Oct. 9, 2009), Pl. Ex. 5 (Doc. 38). At 9:54 a.m. the next day, Hall responded to Muldowney's email message, advising him that Gartrell had reviewed the updated performance improvement plan and Gartrell, Falkowsky, Hall, Diamond, and an operations manager had participated in a telephone conference call on the subject. Email from James Hall to William Muldowney et al. (Oct. 10, 2009), Pl. Ex. 5 (Doc. 38). At 12:21 p.m., Muldowney responded by email: "Okay, I wasn't aware and I just wanted to make sure we were good to go. Thanks." Email from William Muldowney to James Hall et al. (Oct. 10, 2009), Pl. Ex. 5 (Doc. 38).

At about 8:00 p.m. on Saturday, October 10, 2009, Muldowney returned to the Chambersburg distribution center to make a copy of Martin Alvarez's personnel file. He copied Alvarez's entire personnel file, took the copy home in a manila folder, and gave it to his wife, who then sealed it in an envelope and sent it to him by FedEx on Monday, October 12, 2009. Muldowney Dep. 108:9–112:2, Sept. 13, 2011 (Doc. 31). At his second

deposition, Muldowney admitted that he did so with the "definite possibility" in mind that he soon would be terminated. Muldowney Dep. 27:8–15, Feb. 28, 2013 (Doc. 58 attach. 1).

E. MULDOWNEY'S EEOC CHARGE AND TERMINATION

On Sunday, October 11, 2009, Defendants received an email from a paralegal for Muldowney's attorneys, attached to which was a copy of an employment discrimination complaint filed with the Equal Employment Opportunity Commission (EEOC) on Muldowney's behalf.[1] In his EEOC complaint, Muldowney claimed to have been a victim of race discrimination and retaliation. In particular, Muldowney claimed that, after raising his concerns about the May 2009 transfer of Alvarez from first to third shift, he was subject to retaliation in the form of informal criticism of his work absenteeism, his level of engagement, and the professionalism of his dress and appearance, he was given a "bogus" mid-year review rating his performance "below expectations," and he was placed on a performance improvement plan.

On Monday morning, October 12, 2009, Muldowney met with Hall and Diamond in Hall's office, with Gartrell participating by telephone. Hall advised Muldowney that he was being terminated. Hall and Gartrell thanked Muldowney for his service. Muldowney

---

[1] The parties dispute the date upon which Defendants received notice of Muldowney's EEOC complaint. The EEOC complaint and cover letter appear to have been signed and dated by Muldowney and his attorney on October 8, 2009. Pl. Ex. 11 (Doc. 41 attach. 2); Def. Ex. J (Doc. 24 attach. 10); Def. Ex. DD (Doc. 47 attach. 1). The date-stamp on the EEOC complaint indicates receipt by the EEOC's Philadelphia office on October 14, 2009, and Defendants claim that they first received a copy of the EEOC complaint when a paper copy was delivered by certified mail on October 16, 2009. Def. Exs. DD, J. Muldowney, however, has submitted copies of the paralegal's email, together with excerpts from a deposition of that paralegal confirming that she sent the email on October 11, 2009. Pl. Ex. 11. For the purpose of summary judgment, the Court must accept Muldowney's contention that Defendants received notice of the EEOC charge on October 11, 2009.

returned to his office, packed his personal belongings, and said goodbye to some of his coworkers before leaving the Chambersburg distribution center. Muldowney Dep. 118:4–119:24, Sept. 13, 2011 (Doc. 31). Hall later attributed the decision to terminate Muldowney prior to completing his 90-day performance improvement plan to the maintenance manager incident, in which Hall was convinced Muldowney had been lying to him. Hall Dep. 95:5–96:18, Dec. 12, 2011 (Doc. 36); Hall Dep. 51:20–52:21, Aug. 15, 2011 (Doc. 24 attach. 5)

On or about December 20, 2009, Muldowney amended his EEOC charge to add a retaliation claim based on his termination. The EEOC issued a Notice of Right to Sue on or about September 27, 2010.

F. MULDOWNEY'S LAWSUIT AGAINST SEARS AND K-MART

Muldowney filed the Complaint (Doc. 1) in this action on December 16, 2010. Defendants filed their Answer (Doc. 8) on February 11, 2011. Defendants filed their motion for summary judgment (Doc. 22), a brief in support (Doc. 23), and statement of facts (Doc. 24) on January 16, 2012. Muldowney filed his brief in opposition (Doc. 28), an answer to the statement of facts (Doc. 42), and several exhibits (Docs. 29–41) on February 23, 2012. Defendants filed their reply brief (Doc. 46) on March 8, 2012. Following the taking of additional, limited discovery, Defendants filed a supplemental brief with exhibits (Doc. 58) on April 8, 2013. Muldowney filed a supplemental brief in response (Doc. 59) on April 25, 2013.

This matter was referred to the undersigned for a report and recommendation on July 15, 2013. This motion is fully briefed and ripe for decision on the papers. *See* Fed. R. Civ. P. 78(b); L.R. 7.9.

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

### B.   MULDOWNEY'S RACE DISCRIMINATION CLAIMS

In his brief in opposition, Muldowney has expressly declined to pursue his race discrimination claims on summary judgment. Pl. Br. in Resp. 2 n.1 (Doc. 28). He has elected to proceed on his retaliation claim alone, set forth in Count II of the Complaint (Doc. 1). *Id.* As such, Defendants are entitled to judgment on Counts I and III of the Complaint. *Global Tower, LLC v. Hamilton Twp.*, 897 F. Supp. 2d 237, 281 & n.26 (M.D. Pa. 2012).

C. MULDOWNEY'S RETALIATION CLAIM

Muldowney's remaining claim alleges that his employer retaliated against him for opposing race discrimination against another employee, Martin Alvarez. Under Title VII of the Civil Rights Act of 1964, an employer may not "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

A Title VII retaliation claim is analyzed under the familiar three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Weightman v. Bank of N.Y. Mellon Corp.*, 772 F. Supp. 2d 693, 703 (M.D. Pa. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802, 804). Under this framework, the plaintiff at the first step bears the burden of establishing a *prima facie* case of retaliation. *Id.* (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006)); *see also McDonnell Douglas*, 411 U.S. at 802. "If the employee establishes a *prima facie* case, then the burden of production shifts to the employer to articulate a legitimate non-retaliatory reason for the action." *Weightman*, 772 F. Supp. 2d at 703–04 (citing *McDonnell Douglas*, 411 U.S. at 802). "Upon doing so, the burden shifts back to the employee to show that the employer's proffered reason is pretextual . . . ." *Id.* at 704 (citing *McDonnell Douglas*, 411 U.S. at 804).

1. **Muldowney's *Prima Facie* Case**

To establish a *prima facie* case of retaliation under Title VII, an employee must show that: (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action after or contemporaneous with the protected conduct; and (3) there was

a causal connection between his participation in the protected activity and the adverse employment action. *Verma v. Univ. of Pa.*, No. 12-2799, 2013 WL 4010237, at *3 (3d Cir. Aug. 7, 2013) (unpublished opinion); *Weightman*, 772 F. Supp. 2d at 703. The Supreme Court has recently clarified that, with respect to the third prong of this test, an employee asserting a claim of retaliation under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

### a. Protected Activity

Muldowney contends that he engaged in protected activity on three separate occasions. First, he argues that he engaged in protected activity in May 2009 by opposing the allegedly discriminatory transfer of Martin Alvarez from first to third shift. Second, he argues that he engaged in protected activity on October 9, 2009, by opposing the allegedly discriminatory placement of Martin Alvarez on a performance improvement plan. Finally, he argues that he engaged in protected activity when he filed his formal complaint with the EEOC, charging Defendants with employment discrimination.

It is well established that the filing of an EEOC complaint is a protected activity. *See Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995); *Omari v. Waste Gas Fabricating Co., Inc.*, No. Civ. A. 04-696, 2005 WL 545294, at *13 (E.D. Pa. Mar. 4, 2005). Therefore, Muldowney clearly was engaged in a protected activity when he filed his October 2009 EEOC complaint charging Defendants with race discrimination.

However, a formal complaint of discrimination is not the only acceptable indicia of the requisite protected conduct under Title VII. *See Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 287–88 (3d Cir. 2001). Title VII also protects more informal protests of

discriminatory employment practices, such as making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, or expressing support of co-workers who have filed formal charges. 260 F.3d at 288. "For an employee to establish that he engaged in a protected activity, he must put the employer on notice that he believes discrimination is occurring." *DeAngelo v. Entenmann's, Inc.*, No. CV-06-1712, 2007 WL 4378159, at *3 (E.D.N.Y. Dec. 12, 2007); *see also Braden v. County of Washington*, 749 F. Supp. 2d 299, 305 (W.D. Pa. 2010) ("[A] crucial point is the employer's awareness, or potential awareness, that the employee's opposition was directed at prohibited conduct.").

Defendants contend that Muldowney's statements with respect to Alvarez's May 2009 transfer and his October 2009 performance improvement plan do not constitute protected activities because Muldowney did not actually oppose these personnel actions as discriminatory employment practices, but merely questioned whether might *appear* discriminatory with him "out of the loop" when both decisions were made. *See* Def. Br. in Supp. 23 (Doc. 23) (citing *Schoonover v. Schneider Nat'l Carriers, Inc.*, 492 F. Supp. 2d 1103, 1154 (S.D. Iowa 2007) ("A query is not an accusation, the act of asking is distinct from the act of expostulating, and information gathering must precede a critique.")). It is true that "a mere question does not rise to the level of being a protected activity," but "the tone and manner of plaintiff's question . . . may have in fact been sufficiently accusatory so as to put defendants on notice that plaintiff believed they were discriminating against [Alvarez]. *See DeAngelo*, 2007 WL 4378159, at *3 (whether plaintiff's questioning lawfulness of another employee's termination was a protected activity is "a question for a jury to decide"); *see also, e.g.*, *Dotson v. City of Syracuse*, No. 5:04-CV-1388, 2011 WL 817499, at *5–*6 (N.D.N.Y. Mar.

2, 2011) (mere discussion whether plaintiff should file a discrimination complaint constituted protected activity). Indeed, both Hall and Gartrell themselves admitted at deposition that they were under the impression that Muldowney believed these employment actions were, or at least appeared to be, discriminatory employment actions. Hall Dep. 73:8–20, 94:15–22, Dec. 12, 2011 (Doc. 36); Gartrell Dep. 19:1–2, Aug. 16, 2011 (Doc. 40); *see also Thompson v. Tractor Supply Co.*, No. 10-234, 2011 WL 4433268, at *11 (W.D. Pa. Sept. 21, 2011).

Moreover, the Supreme Court's opinion in *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 555 U.S. 271 (2009), suggests a more expansive reading of the term "oppose" in this context than the *Schoonover* court applied. Applying circuit precedent as it then existed, the *Schoonover* court limited the scope of protected "opposition" under 42 U.S.C. § 2000e-3(a) to situations in which the employee-plaintiff actively reported or complained of discriminatory practices. *See Schoonover*, 492 F. Supp. 2d at 1152, 1153. But two years later in *Crawford*, the Supreme Court held that "[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize . . . ; to contend against; to confront; resist; withstand.'" *Crawford*, 555 U.S. at 276 (quoting *Webster's New International Dictionary* 1710 (2d ed. 1958)). The term "oppose," the Supreme Court then observed, "goes beyond 'active, consistent' behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it." *Id.* at 277 ("Countless people were known to 'oppose' slavery before Emancipation, or are said to 'oppose' capital punishment today, without writing public letters, taking to the streets, or resisting the government."). Thus, "'[w]hen an employee communicates to her employer a belief that the employer has

engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's *opposition* to the activity.'" *Id.* at 276 (citing with approval 2 *EEOC Compliance Manual* §§ 8-II-B(1), (2), p. 614:0003 (Mar. 2003)).

Viewed in the light most favorable to Muldowney, his disclosure of "serious concerns" that Alvarez's May 2009 transfer and October 2009 performance improvement plan might be discriminatory may constitute opposition to discriminatory employment practices, thereby creating a triable issue of fact as to whether Muldowney engaged in protected activity prior to the filing of his formal EEOC complaint in October 2009. That is, a reasonable jury could conclude from the evidence of record that Muldowney effectively communicated to his employer his belief that Alvarez was transferred from first to third shift in May 2009 and placed on a performance improvement plan in October 2009 because of his race.

### b.  Adverse Employment Action

It is beyond cavil that Muldowney's termination is an adverse employment action. *See Dulina v. Hometown Nursing & Rehab. Ctr.*, No. 3:09-CV-0458, 2010 WL 6490009, at *5 (M.D. Pa. Dec. 21, 2010). Muldowney contends that his receipt of a negative performance evaluation and his placement on a performance improvement plan are also adverse employment actions. Ordinarily, a negative performance evaluation or placement on a performance improvement plan "is not an adverse employment action absent accompanying changes to pay, benefits, or employment status." *See Reynolds v. Dep't of the Army*, 439 Fed. App'x 150, 153–54 (3d Cir. 2011) (unpublished opinion)(relying on *Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir.2009); *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir.2006); *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir.2005)); *Boandl v. Geithner*,

752 F. Supp. 2d 540, 565 (E.D. Pa. 2010) (finding an adverse action for a retaliation claim could exist where "[a]long with the negative performance evaluation, [an employee receives] an Opportunity to Improve letter affording him 120 days to improve his performance, inform [ing] him that his work would be periodically reviewed, and [telling] him that if he did not improve his performance, he would face termination"). But in this case, Muldowney's negative 2009 mid-year review and his performance improvement plan were accompanied by his ultimate termination, ostensibly for reasons articulated in his mid-year review and performance improvement plan. Viewed in the light most favorable to Muldowney, all three of these employment actions – his negative 2009 mid-year review, his placement on a performance improvement plan, and his ultimate termination on October 12, 2009 – constitute adverse employment actions.

c.  Causation

"[I]n cases where a plaintiff must illustrate a 'causal link' for purposes of establishing retaliation . . . a plaintiff may rely upon a broad array of evidence to do so." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283-84 (3d Cir. 2000). Here, Muldowney has relied upon the temporal proximity of his October 12, 2009, termination to his October 9, 2009, email raising concerns about Martin Alvarez's placement on a performance improvement plan, and the filing of his EEOC complaint, allegedly received by his employer by email on October 11, 2009.

"Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). Indeed,

the Third Circuit has previously held that a plaintiff demonstrated a causal link when his termination followed only two days after his employer received notice of his filing of a discrimination complaint with the EEOC. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989). Here, Muldowney's termination followed only *one* day after his employer received notice of his filing of an EEOC complaint, and only three days after he communicated his concern that Alvarez's placement on a performance improvement plan might be discriminatory.[2]

Defendants argue that, notwithstanding the undisputed fact that Muldowney was terminated on October 12, 2009, temporal proximity in this case is insufficient to establish a causal link because the *decision* to terminate Muldowney was made by Hall, Falkowsky and Gartrell four days earlier, on October 8, 2009, before Defendants had notice of either of these alleged protected activities. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 415 (3d Cir. 1999) (no causal link where EEOC filings were made *after* the alleged adverse employment action). In his deposition, Hall described the timing of the decision to terminate Muldowney:

> The phone screen incident happened on Wednesday, October 7th. I took partners with Alan and Brian on the evening of Wednesday, October 7th. On Thursday I asked Bill to describe what happened in a written statement. Again, I partnered with Brian and Alan later that afternoon, and the decision was made to terminate Bill the following day, October the 9th. But Bill called in sick that day, so we terminated him the following morning.

---

[2] The Court notes that the Third Circuit has previously "declined to infer such a causal link where an employee's negative performance evaluations predated any protected activity." *Verma*, 2013 WL 4010237, at *4; *see also Shaner v. Synthes (USA)*, 204 F.3d 494, 504–05 (3d Cir. 2000). But in this case, Muldowney's first negative performance evaluation was received in August, three months *after* he expressed his concerns in May that Alvarez's transfer might be discriminatory.

Hall Dep. 52:11–21, Aug. 15, 2011 (Doc. 24 attach. 5); *see also* Hall V.S. ¶ 16 (Doc. 24 attach. 3) ("The decision to terminate Mr. Muldowney's employment was made on October 8, 2009."). As Muldowney has noted in his opposition brief, neither Gartrell nor Falkowsky addressed the date of their decision to terminate Muldowney in their respective depositions, but to further buttress this fact contention, Defendants have submitted verified statements by Gartrell and Falkowsky, each of whom definitively states in identical fashion: "I participated in the decision to terminate William Muldowney's employment on October 8, 2009. . . . The decision was made on October 8, 2009 to terminate Mr. Muldowney's employment on Friday, October 9, 2009." Gartrell V.S. ¶¶ 2–3 (Doc. 47 attach. 1); Falkowsky V.S. ¶¶ 2–3 (Doc. 47 attach. 1). A similar verified statement by Diamond was also submitted to corroborate the others. *See* Diamond 2d V.S. ¶ 3 ("I was informed by James Hall on October 8, 2009 that the decision had been made to terminate William Muldowney's employment the next day, Friday, October 9, 2009.").

Importantly, Defendants have cited no documentary evidence in the record to corroborate either Hall's testimony or the conclusory declarations by Gartrell, Falkowsky, and Diamond. Although self-serving testimony ordinarily can be used to obtain summary judgment, a movant cannot rely solely on its own presentation of evidence where the question of fact at issue turns exclusively on the credibility of the movant's own witnesses. *See Cross v. United States*, 336 F.2d 431, 433 (2d Cir. 1964); *Williams v. Wells Fargo Fin. Acceptance*, 564 F. Supp. 2d 441, 447 (E.D. Pa. 2008), citing *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 237, 238 (3d Cir. 2007) ("When a witness's credibility is critical to supporting the necessary findings of fact, the district court must consider whether there are sufficient grounds for impeachment that would place the facts to which he testifies in

legitimate dispute.... [Q]uestions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will [defeat a motion for summary judgment]."); Fed. R. Civ. P. 56 advisory committee notes (1963) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."). Thus, the testimonial evidence submitted by Defendants is insufficient to establish the absence of a genuine dispute of material fact as to whether a causal link exists between the protected activities and adverse employment actions alleged in this action.

With respect to Muldowney's May 2009 expression of concern regarding the Alvarez transfer, there is a three- to five-month gap between that protected activity and his receipt of a negative mid-year review in August, his placement on a performance improvement plan in September, and his termination in October. Standing alone, this time period is not "unusually suggestive" and, without more, it cannot to support an inference of causation. *See Breeden*, 532 U.S. at 273 (three-month gap insufficient); *LeBoon*, 503 F.3d at 233 (same); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five-month gap insufficient). Where the temporal proximity is not "unusually suggestive," the Court must consider whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *LeBoon*, 503 F.3d at 232; *Farrell*, 206 F.3d at 280. "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d at 232–33.

Viewed in the light most favorable to Muldowney, the evidence indicates that, over a period of a few days beginning on May 20, 2009, Muldowney communicated his concern

that the Alvarez transfer might be discriminatory to Hall, Diamond, Gartrell, and Jasper. On May 21, June 24, and July 15, Hall met with Muldowney to "coach" him on perceived performance deficiencies, including his allegedly questionable integrity. At the end of August, Hall gave Muldowney a negative mid-year review – apparently his first – including questionable integrity as one of Muldowney's primary shortcomings. Indeed, Muldowney's mid-year review explicitly referenced Muldowney's absence when Hall and Diamond attempted to locate him to discuss the Alvarez transfer on May 20 and his counseling session with Hall the next day, his misuse of the company credit card, for which he was informally counseled by Hall on June 24, and his false excuse for missing a human resources conference call, for which he was informally counseled by Hall on July 15. Muldowney Dep. Ex. 8, at 2, 6–7 (Doc. 33). On September 15, Hall placed Muldowney on a performance improvement plan, with integrity as one of the four areas identified as an area needing improvement. In October, in the immediate wake of the maintenance manager incident, Muldowney was terminated for lack of integrity. Considered together, and in the light most favorable to the non-movant, these events constitute an intervening pattern of antagonism sufficient to support a causal link between Muldowney's comments in May and his termination five months later in October. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997) ("While each piece of evidence alone is not sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient."); *Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1993).

Accordingly, viewed in the light most favorable to Muldowney, the facts of record are sufficient to establish a causal link between the alleged protected activities and the alleged adverse employment actions.

### 2. <u>Articulation of a Legitimate, Non-Discriminatory Reason for Termination</u>

Muldowney has satisfied his burden at the first step of the *McDonnell-Douglas* framework by establishing a *prima facie* case of Title VII retaliation. At the second step, the burden of production shifts to Defendants to articulate a legitimate non-retaliatory reason for Muldowney's termination. This "relatively light burden" is satisfied "by introducing evidence which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Defendants need not prove that the articulated reason *actually* motivated the termination. *Id.*

Here, Defendants have articulated a variety of performance issues on Muldowney's part as the reason for his discharge. In support, they have submitted negative performance reviews, verified statements, and deposition testimony which suggest significant questions regarding Muldowney's integrity, as well as some history of other performance and accountability issues. Based on this evidence, a reasonable jury could conclude that Defendants terminated Muldowney for legitimate, non-discriminatory reasons. Accordingly, Defendants have met the "relatively light burden" of articulating a legitimate, non-discriminatory reason for Muldowney's termination.

### 3. <u>Pretext</u>

Defendants have satisfied their burden to articulate a legitimate, non-discriminatory reason for Muldowney's termination. Thus "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Fuentes*, 32 F.3d at 763. To prove that a proffered legitimate reason is not the true reason for an adverse

employment action, but rather a pretext for prohibited retaliation, Muldowney must show "*both* that the reason was false, *and* that [retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Ultimately, "[t]o prevail at trial, [Muldowney] must prove not that the illegitimate factor was the *sole* reason for the decision, but that the illegitimate factor was a *determinative* factor in the adverse employment decision, that is, that but for the protected [conduct]," Muldowney would not have been terminated. *Fuentes*, 32 F.3d at 764.

To prevail at the summary judgment stage, Defendants must show that, based on the facts of record viewed in the light most favorable to the non-movant, Muldowney simply *cannot* produce sufficient evidence of pretext to rebut Defendants' assertion of legitimate, non-discriminatory reasons for Muldowney's termination. *Jalil*, 873 F.2d at 707.

> Summary judgment is inappropriate, however, if the plaintiff establishes a prima facie case and counters the defendant's proffered explanation with evidence raising a factual issue regarding the employer's true motivation for discharge. When the defendant's intent has been called into question, the matter is within the sole province of the factfinder.

*Id.* On this point, summary judgment is inappropriate because, as Muldowney has pointed out in his opposition papers, the timing of his termination alone suggests a discriminatory motive on the part of Defendants. *See id.* at 709. This is further bolstered by the timing of Hall's increasingly critical informal counseling sessions soon after Muldowney expressed his concern about the Alvarez transfer. Moreover, in his opposition papers, Muldowney also has pointed out certain inconsistencies between Hall's deposition and verified statement, on the one hand, and the deposition testimony of other senior managers and Defendants' formal response to the EEOC complaint, on the other. Based on all of this, it is clear that, with respect to pretext, the evidence has created a factual issue regarding Defendants'

motivation that properly belongs to the jury.

**III.** **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that Defendants' motion for summary judgment (Doc. 22) be **GRANTED in part and DENIED in part**, that judgment be entered in favor of the Defendant with respect to Counts I and III of the Complaint (Doc. 1), and that the case be scheduled for a jury trial with respect to Count II of the Complaint (Doc. 1).


BY THE COURT:

Date:   September 24, 2013                      */s/ Karoline Mehalchick*
                                               KAROLINE MEHALCHICK
                                               United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM MULDOWNEY, | CIVIL ACTION NO. **1:10-CV-2555** |
| Plaintiff, | |
| | (CONNER, C.J.) |
| v. | (MEHALCHICK, M.J.) |
| K-MART CORPORATION, et al., | |
| Defendants. | |

<u>**NOTICE**</u>

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **September 24, 2013**.

Any party may obtain a review of the Report and Recommendation pursuant to Rule

72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Dated: September 24, 2013

/s/ *Karoline Mehalchick*

KAROLINE MEHALCHICK
United States Magistrate Judge